UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


**Jason Shulkin**

    **v.**                                        Civil No. 10-cv-451-PB
                                                 Opinion No. 2012 DNH 007
**Michael J. Astrue, Commissioner,**
**Social Security Administration**



**MEMORANDUM AND ORDER**

Jason Shulkin seeks judicial review of a decision by the
Commissioner of the Social Security Administration denying his
application for disability insurance and supplemental security
income benefits.  Shulkin alleges that the decision finding him
not disabled is unsupported by substantial evidence, and
specifically, that the Administrative Law Judge in his case
erred in failing to consider testimony, in making vocational
determinations, and in assessing credibility.  For the reasons
provided below, I grant Shulkin's motion to reverse the
Commissioner's decision.

## I.   BACKGROUND[1]

### A.   Procedural History and Personal Background

Shulkin applied for disability insurance and supplemental security income benefits ("DIB" and "SSI") on May 28, 2008.  The application was denied on November 5, 2008.  Shulkin requested a hearing before an Administrative Law Judge ("ALJ"), and a hearing was held on April 6, 2010.  By decision dated May 7, 2010, the ALJ found that Shulkin was not disabled.  The Decision Review Board selected the case for review, but did not complete its review within the time allotted, thus leaving the ALJ's decision as the final decision of the Commissioner.

Shulkin was 24 years old as of the date of the hearing and had worked in the past, but had not had earnings in excess of substantial gainful activity levels.  He is an unmarried high school graduate who lives with his parents and takes classes at the New Hampshire Institute of Art.

---

[1] Except where otherwise noted, the background information is drawn from the parties' Joint Statement of Material Facts (Doc. No. 12).  See LR 9.1(b).  I cite to the administrative record with the notation "Tr."

B.  __Medical History__

    1.  __Treatment History__

    In June 2004, while Shulkin was being treated at Northeast Rehabilitation Health Network for unrelated back pain and spasms, he filled out a questionnaire.  In response to a question asking if he "recently experienced loss of appetite, anxiety/mood changes, or significant weight gain or loss," Shulkin answered that he was experiencing increased depression and anxiety, and was eating less despite more constant hungriness.  The form also asked whether he had any emotional difficulties, and he noted that he was experiencing social anxiety.

    Dr. Edward Jacobs, Ph.D., treated Shulkin from November 2004 through March 2006.  In a form Dr. Jacobs filled out in April 2007, he stated that Shulkin had ADHD, mood disorder, and anxiety disorder.  The doctor opined that Shulkin's lack of independence in planning and initiation resulted in a poor ability to define goals and to initiate and complete actions to meet those goals.  He further noted that although Shulkin had social relationships, he was very dependent on others.  On Shulkin's ability to perform tasks, Dr. Jacobs stated that he had "poor attention to task, poor initiation and follow through,

[and was] highly distracted."  He also indicated that Shulkin exhibited severe anxiety symptoms when under stress.

Shulkin was treated by the Southern NH Internal Medicine Associates between August 2006 and April 2008.  In his August 2006 treatment notes, Mark B. Richard, M.D., indicated that Shulkin suffered from bipolar disorder and that the disorder was fairly well controlled by a combination of Seroquel, Lithium, Abilify and Klonopin.  At office visits in March and April 2008, Shulkin complained of ADD, anxiety, and depression.

From July 2005 through February 2010, Shulkin was treated on a fairly regular basis by Marc M. Sadowsky, M.D., a psychiatrist at New England Neurological Associates, P.C.  Over the course of that relationship, Dr. Sadowsky treated Shulkin for a variety of symptoms, many of which increased or decreased in severity across the span of treatment.  Specifically, Dr. Sadowsky's notes reveal that Shulkin complained of mood variability, episodes of racing thoughts, irritability, concentration deficits, anxiety, trouble sleeping, inability to control anger, memory problems, suicidal ideation, mania, and episodes of altered perception.  Dr. Sadowsky prescribed a number of medications across the treatment period, including Lithium, Wellbutrin XL, Clonazepam, Lamictal, Seroquel, Trazadone, and Abilify.

Dr. Sadowsky's treatment notes also indicate a number of events in Shulkin's life that are of potential relevance to the disability determination.  In a January 2006 visit, Shulkin told the doctor that he was having difficulties at home, and had "lost control screaming for a couple of days."  (Tr. 237). Later that month, Shulkin called Dr. Sadowsky because he was having significant anxiety about starting a new job.  He told the doctor that he did not like the prospect of having to spend a lot of time at work.  He also noted a longstanding anxiety about making telephone calls and was worried because the new job entailed making calls on a regular basis.

At a May 2006 visit, Shulkin told the doctor that he had been having significant difficulties recently and had been quite agitated.  He spoke about several episodes where he became angry in response to minimal provocation.  For example, he had broken a door in an apartment and had bashed a plastic bottle over a friend's head.  He also expressed concern about losing his relationship with his fiancée.

In August 2006, Shulkin told the doctor that he was experiencing some frustration with his new job as a photographer and was having difficulty getting along with his father at home. The following month, Shulkin reported to Dr. Sadowsky that

things were going well for him at school.  A month later,
Shulkin stated that he had been enjoying a photography class.

In November 2006, Shulkin indicated to Dr. Sadowsky that he
had been feeling somewhat overwhelmed.  He had quit his job
because he was unable to keep up with the demands of the holiday
season.  He expressed that his job situation, in combination
with attending school and trying to manage a relationship, was
too much to handle.

At an appointment in December 2006, Shulkin reported to the
doctor that he and his girlfriend had again decided to get
married.  He noted that he had not been working, though he
planned to look for a job in the new year.  He was still having
difficulties in his relationship with his father.

At an April 2007 visit, Shulkin told Dr. Sadowsky that he
had been taking several courses and had been working at a
photography studio at the mall.  He continued to have dips into
depression, but had been able to keep up with his obligations.
In June of that year, Shulkin indicated that he was somewhat
bored by his photography job and was thinking about ways to take
his own pictures on the side to continue to develop as a
photographer.  The following month, Shulkin told the doctor that
he had been admitted to art school in Manchester.

At an April 2008 visit, Shulkin told Dr. Sadowsky that he had been doing fairly well at school. He was taking a full load of courses and stated that he might do some work as a teaching assistant over the summer. In late June, however, Shulkin stated that he had not been doing much during the summer to date, and although he anticipated having a volunteer job, it would not start until the end of July.

That July, Shulkin told Dr. Sadowsky that he had broken up with his girlfriend. He stated that he was looking forward to meeting new people. He continued to feel less creative than he would have liked, and attributed the lack of creativity to his medications.

At a November 2008 visit, Shulkin reported that he had been active at school. He was participating in the student council and had started a game group. That December, Shulkin told the doctor that he had done fairly well in school, getting mostly A's and B's. He also received one C-, about which he complained.

In March 2009, Shulkin reported that he had broken off with his current girlfriend. He was busy at school, which he noted was going well. At a visit two months later, Shulkin stated that he had finished his classes and would be doing some volunteer work, both at his school and with a game group.

7

At a September 2009 visit, Shulkin told the doctor that things had gotten worse for him for several weeks after an increase in dosage of one of his medications.  He was more anxious and unable to drive for a period of time.  He also expressed that he may have become manic as school started, noting that his happiness at seeing people felt unnaturally excessive.

At an appointment in October 2009, Shulkin reported that he had been enjoying school, particularly his story-telling class. He told the doctor that he was experiencing periods of "depersonalizing," which he explained were times when he felt lessened anxiety, when he could do things more naturally without feeling totally conscious of every action.

**2.  Consultative Examination & Non-Examining Psychologist Opinion**

On September 23, 2008, at the request of the Social Security Administration, Shulkin saw William Swinburne, Ph.D., for a consultative examination.  After the evaluation, Dr. Swinburne opined that the plaintiff's level of functioning was as follows:

> 1.   <u>Understanding and Memory</u>:  The claimant can understand and remember short and simple instructions.
>
> 2.   <u>Social Functioning</u>:  Socially, he is shy and avoidant of interacting with people, but can relate to

others in a socially appropriate manner when needing to.

3.  <u>Concentration and Task Completion</u>:  The claimant can focus his attention on a task and see the task through completion.

4.  <u>Adaptation to Work or Work-like Situations</u>: In a work-like situation, the claimant would experience significant anxiety which may interfere with him providing reasonably good attendance.  He will be avoidant of going to the job site and encountering people and the demands of the job.  He can be expected to relate superficially reasonably well with co-workers and to take instruction as well as to be supervised.  It is anticipated that he would hold in his anxiety and build up a stress level that will become overwhelming within a day or two resulting in his leaving the job or not returning.  On the job he will have difficulty tolerating the average stressors found on most jobs.  He probably would do better being left alone to do his work without close supervision. (Tr. 197-98).

In his diagnosis, Dr. Swinburne ruled out bipolar II disorder, and determined that Shulkin suffered from mood disorder, anxiety disorder, and an avoidant personality.

On September 24, 2008, Michael Schneider, Psy.D., a non-examining psychologist employed by the Disability Determination Service, reviewed the medical information in Shulkin's file and filled out a Psychiatric Review Technique form and a Mental Residual Functional Capacity form.  On the former, Dr. Schneider indicated that Shulkin suffered from affective disorders, anxiety-related disorders, and personality disorders.  In regard to the personality disorder, the doctor noted that there was

evidence that Shulkin was inflexible and had maladapted personality traits which caused significant impairment in social or occupational functioning or subjective distress, as evidenced by seclusiveness and autistic thinking.  The psychologist opined that he had moderate degrees of limitation in the functional areas of restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace.  He noted there were no episodes of decompensation of extended duration.

On the other form, Dr. Schneider opined that Shulkin was moderately limited in the following: ability to understand and remember detailed instructions; ability to carry out detailed instructions; ability to work in coordination or proximately to others without being distracted by them; ability to complete a normal work week and work day without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; ability to interact appropriately with the general public; ability to accept instructions and respond appropriately to criticism from supervisors; and ability to respond appropriately to changes in the work setting.  In all other functions, the doctor stated that Shulkin was not significantly limited.

10

After explaining that he gave the most weight to the
psychological consultative examination of Dr. Swinburne, Dr.
Schneider summarized his findings and rationale as follows:

> The claimant does have a severe impairment, which does
> not currently meet or equal listings levels.  Despite
> the claimant's impairment, he retains the ability to
> understand, remember and carry out short and simple
> instructions without special supervision.  Of note,
> the claimant is presently a full time student at a
> local college.  He is able to maintain adequate
> attention for these kinds of instructions and complete
> a normal workweek, albeit with some interruptions.
> These interruptions will not be unreasonable for the
> work site.  In an environment where he is in a
> somewhat socially isolated workstation, does not have
> to interact with the general public and where
> supervisory criticism is not overly critical of his
> performance, he is able to interact appropriately with
> peers and supervisors.  Under those conditions, he is
> able to accommodate to changes in a work setting.
> (Tr. 192).

## C.  **Testimony**

### 1.  **Shulkin's Testimony**

Shulkin testified at the April 2010 hearing before the ALJ.
He stated that he had suffered from anxiety problems for as long
as he could remember.  In addition to anxiety, he testified that
he had an inability to deal with stress, and that everyday
activities exacerbated his stress levels.  He explained that he
had to "well it all up and force myself to kind of put [it] into
a ball inside of me and later it comes out usually in anger."
(Tr. 20).  In the past, fits of blind rage had caused him to

physically abuse his mother.  More often, however, he would space out by watching a movie or playing a video game so that he would not have to think about or deal with anything.

Shulkin testified that because of his medications, he felt like he was "drunk most of the day [with] some enhanced hallucinations." (Tr. 21).  Explaining his perceptions, he stated that his vision "seems to form like, sort of like a tunnel and then there are points where it just snaps and I'm, I'm extra aware to the rest of the world around me and it's pretty disorienting." (Tr. 21).  He recounted that one such experience led him to stop riding his motorcycle.

Discussing his activities of daily living, Shulkin testified that he neglected much, including regularly cleaning himself.  He had trouble remembering what he needed to get done and he took a lot of breaks every day.  He testified that he lived with his parents, and that they did most of the housework and helped him with his activities of daily living.  He stated that he probably spent about six hours each day just trying to relax, even if he had something that he needed to complete. After an hour or two of homework he would feel justified in taking a four-hour break afterwards, regardless of the amount of homework left.

He was taking classes at the New Hampshire Art Institute, where he was studying photography, and testified that although he had class every day, his average weekly course load was between twelve and fifteen hours, depending on whether he stayed after class.  On certain days of the week he had less than two hours of class.  Shulkin testified that he was able to stay in school because he was given a number of accommodations.  For example, he received extensions on "pretty much everything," and when he took tests he was allowed to bring his notes into the classroom.  (Tr. 23-24).  Occasionally, he was even told what questions might be on the test so that he could search for the answers ahead of time.  Additionally, he was allowed to do extra papers when he did poorly on other assignments.

Shulkin testified that he had problems dealing with other people.  He explained:

> I have to pretty much pretend like I'm someone else. At the moment I'm, I have that same façade on right now, with me trying to be strong and, and keep myself composed for this meeting here.  It's, it's difficult because I don't speak what I really think or feel and I don't really get to feel the emotions that I want to feel and, yeah, I kind of have to just keep quiet and hang out with the pack.  For jobs, any kind of, any kind of conflict I've pretty, you know, like agree with them and just kind of take whatever punishment and abuse that I'm getting from it.
> (Tr. 25).

13

He stated that he internalized the conflicts, and that as a result he would have anxiety attacks.  He elaborated: "I throw up, scream, yell, break things.  There's many holes in my wall from the times I've punched [it], punched my hand through it." (Tr. 25).

Shulkin testified that when he was working, he would come home and throw up because he "just couldn't take it."  (Tr. 25). In prior work situations he had asked his mother to quit for him, and once, his mother did call up an employer to explain that he would not be coming in anymore.

Shulkin stated that he was totally dependent on his parents and he was unable to live on his own or be independent.  He testified that he was unable to manage his finances well, keep track of his medicine, or generally care for himself. Discussing his ability to maintain attention to a task through to completion, Shulkin testified that he was usually able only to get one step done at a time before he would forget the process and have to ask questions.  He noted that he always procrastinated and took many breaks.  When posed a question asking whether he would be able to work eight hours a day, five days a week, Shulkin responded that he would not be able because he could not get the breaks he needed.  Without enough breaks,

14

he would get shaky and start feeling like he would "nearly explode."  (Tr. 27).

Shulkin testified that he had a hard time keeping friends and stated that he thought he operated very differently from other people.  He explained that he would blurt out statements he did not mean, and was prone to asking inappropriate questions.  Only a couple of select friends were willing to put up with his eccentricities.

### 2.  Father's Testimony

Shulkin's father, Peter Shulkin ("Mr. Shulkin"), also testified at the hearing, and gave examples of his son's behavior at home.  He explained, for example, that when his son was in his room playing video games, even knocking on the door would sometimes provoke a verbal lash in response.  Mr. Shulkin noted that sometimes he would be speaking with his son and for no apparent reason he would "blow up[] and start yelling" at him.  (Tr. 29).  He recounted a specific example of Shulkin's violent outbursts:

> [S]everal years ago, he was in high school at the time, and he left the house because he was angry with us and it was raining out and I had to go track him down, find him, and he started to attack me and I literally had to grab him and hold onto him and keep telling him I love you, everything's fine, just relax and be calm.  And it took a good 15/20 minutes before he would even stop trying to hit me and then all of a

sudden it was like it shut off and he was just crying
and he was not violent at all.
(Tr. 29).

Mr. Shulkin testified that his son had difficulty
concentrating, and would frequently fail to remember that he had
class or had an assignment due.  Mr. Shulkin explained his
belief that his son's thought processes were different from
others'.  As an example, he stated that his son had wanted to
quit high school only two-and-a-half months prior to graduation
because he hated getting up early in the morning, taking the
bus, and going to his first class.  He was able to graduate only
when his guidance counselor allowed him to skip his first class
and his mother agreed to drive him to and from school for the
rest of the year.

Mr. Shulkin also testified about his son's side effects
from the medication he was taking.  He described moments where
his son seemed barely awake or very weak.  He also explained
that his son's class schedule had to be adjusted to accommodate
his medication schedule.

Mr. Shulkin opined that his son would be unable to work
eight hours a day, five days a week because "Jason has a
tendency to find a problem with someone . . . and allows that to
gnaw at him and[] grow to be [] an insurmountable problem and
then . . . he just can't continue and he's gotten to the point

16

where he doesn't blow up at the location, he comes home and
blows up[.]" (Tr. 32).  Mr. Shulkin expressed that his son
would be unable to return to the job after blowing up at home
and would have to quit.  Mr. Shulkin testified that his son had
suffered the same mental problems throughout his life and that
family therapy had proven to be an ineffective solution.

**D.   ALJ's Decision**

On May 7, 2010, the ALJ found that Shulkin had not engaged
in substantial gainful activity since August 5, 2004, and that
his depression and anxiety were both severe impairments.
Neither the impairments separately, nor in combination, however,
met or equaled a listing level impairment.

The ALJ found that Shulkin had the residual functional
capacity ("RFC") to perform a full range of work at all
exertional levels, but with the non-exertional limitation that
he had to avoid high stress work environments and intense
interaction with supervisors, co-workers, and the public.  The
ALJ determined that he was capable of performing his past
relevant work as a clerk because such work did not entail any of
the activities precluded by his RFC.  In the alternative, the
ALJ determined that in light of Shulkin's age, education, work
experience, and RFC, Shulkin could also perform other jobs that
existed in significant numbers in the national economy.

Accordingly, the ALJ found that Shulkin was not disabled.  The ALJ did not utilize a vocational expert in reaching his determination.

## II. <u>STANDARD OF REVIEW</u>

Under 42 U.S.C. § 405(g), I am authorized to review the pleadings submitted by the parties and the administrative record and enter a judgment affirming, modifying, or reversing the "final decision" of the Commissioner.  My review "is limited to determining whether the ALJ used the proper legal standards and found facts [based] upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).

The findings of fact made by the ALJ are accorded deference so long as they are supported by substantial evidence.  Id. Substantial evidence to support factual findings exists "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.'" Irlanda Ortiz v. Sec'y of Health and Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (quoting Rodriguez v. Sec'y of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  If the substantial evidence standard is met, factual findings are conclusive even if the record "arguably could support a different conclusion." Id. at 770.  Findings are not

conclusive, however, if they are derived by "ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

The ALJ is responsible for determining issues of credibility and for drawing inferences from evidence on the record. Ortiz, 955 F.2d at 769. It is the role of the ALJ, not the court, to resolve conflicts in the evidence. Id.

The ALJ follows a five-step sequential analysis for determining whether an applicant is disabled. 20 C.F.R. §§ 404.1520, 416.920. The applicant bears the burden, through the first four steps, of proving that her impairments preclude her from working. Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001). At the fifth step, the Commissioner determines whether work that the claimant can do, despite her impairments, exists in significant numbers in the national economy and must produce substantial evidence to support that finding. Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).


## III.  ANALYSIS

Because the ALJ in this case ignored relevant testimony and inadequately explained how cited evidence supported his conclusions, he failed to adequately address and reconcile conflicts in the evidence.  I therefore reverse the

Commissioner's decision.  In light of that outcome, I need not address the other claims raised by Shulkin.

## A.  Mr. Shulkin's Testimony

An ALJ's assessment of a claimant's RFC "must be based on all of the relevant evidence in the case record."  Social Security Ruling 96-8p, 1996 WL 374184, at *5 (July 2, 1996); see also 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).  Among other things, an ALJ is to "consider descriptions and observations of [a claimant's] limitations . . . provided by [the claimant, his] family, neighbors, friends, or other persons."  20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).  In this case, Shulkin asserts, and the Commissioner concedes, that the ALJ failed to address the testimony given by Mr. Shulkin.  The Commissioner contends, however, that the omission does not require reversal because Mr. Shulkin's testimony was cumulative of other evidence and contradicted by substantial evidence in the record, specifically Dr. Sadowsky's report and the treatment notes of Dr. Swinburne.

The Commissioner is correct to note that an ALJ is not bound to directly address every piece of evidence in the record.  Rodriguez v. Sec'y of Health & Human Servs., 915 F.2d 1557, 1990 WL 152336, at *1 (1st Cir. 1990) (per curiam; table, text available on Westlaw); see also Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998).  For example, an ALJ's written decision

need not specifically discuss pieces of evidence that are cumulative of evidence he has already discussed or that fail to support a claimant's position.  See Dube v. Astrue, 781 F. Supp. 2d 27, 35 (D.N.H. 2011); Lord v. Apfel, 114 F. Supp. 2d 3, 13 (D.N.H. 2000).  Moreover, a failure to ignore a piece of evidence may be harmless error where substantial evidence exists in the record to discredit that piece of evidence.  See, e.g., Phelps v. Astrue, No. 10-cv-2440-SM, 2011 WL 2669637, at *7 (D.N.H. July 7, 2011); Fedele v. Astrue, Civil No. 08-cv-520-JD, 2009 WL 1797987, at *5 (D.N.H. June 3, 2009).

Nonetheless, an ALJ cannot simply ignore relevant portions of the record that conflict with his determination.  See Chater, 172 F.3d at 35; Dube, 781 F. Supp. 2d at 35; Lord, 114 F. Supp. 2d at 13-14.  Although it is the province of the ALJ to resolve conflicts in the evidence, he has not adequately fulfilled that function where he "adopt[s] one view of the evidence, 'without addressing the underlying conflict.'"  Dube, 781 F. Supp. 2d at 35 (quoting Nguyen v. Callahan, 997 F. Supp. 179, 182 (D. Mass. 1998)).

I conclude that Mr. Shulkin's testimony supported his son's position and was not cumulative of other evidence discussed by the ALJ.  It was therefore error for the ALJ to ignore Mr. Shulkin's hearing testimony.

21

The gist of the testimony was that his son's mental
problems would prevent him from engaging in full-time work.  As
support for that position, Mr. Shulkin recounted particular
instances where his son exhibited strange behavior and thoughts,
and opined that his son would be unable to tolerate the demands
of a forty-hour workweek for more than a short time before
stress and/or anxiety would cause him to "blow up" and quit.
Mr. Shulkin's testimony was the sole evidence independent of
Shulkin himself that described the ways that Shulkin's symptoms
limited his lifestyle and capacity to function.  See 20 C.F.R. §
404.1529(c)(3) (because of difficulty in assessing subjective
complaints in situations where objective evidence alone cannot
show the severity of impairment, ALJs are instructed to
"carefully consider" evidence, including lay testimony, that
corroborates a symptom and its associated limitations).  The
testimony was not merely cumulative, as urged by the
Commissioner, because it provided additional details to
corroborate Shulkin's account and gave a history of Shulkin's
behavior at home and at work that is not present anywhere else
in the record.  See Willcockson v. Astrue, 540 F.3d 878, 881
(8th Cir. 2008) (noting that witnesses such as family members
may be the only ones to witness a claimant's difficulties, and

that it is error to wholly ignore testimony from such lay witnesses).

Not only did the ALJ fail to incorporate Mr. Shulkin's testimony into his determination, the ALJ's opinion does not even mention that Mr. Shulkin testified.  Although the ALJ could have discounted or discredited Mr. Shulkin's lay testimony, it was error for the ALJ to altogether ignore it.  See Chater, 172 F.3d at 35 (ALJ's findings are not conclusive when derived by ignoring evidence).

## B.   Whether Decision is Supported by Substantial Evidence

The Commissioner argues that the ALJ's omission of Mr. Shulkin's testimony is harmless error because substantial evidence nevertheless supports the ALJ's determination.  I find to the contrary.  Other portions of the ALJ's discussion further compound the error and necessitate reversal of the decision. Specifically, the ALJ's analysis of Shulkin's credibility indicates that the ALJ took into account only the evidence that supported his view that Shulkin was capable of full-time work, and ignored important contradictory evidence.

In addressing the credibility of Shulkin's statements about the limitations imposed by his symptoms, the ALJ found that although Shulkin's medically determinable impairments could cause the symptoms he alleged (and that were corroborated by his

father), Shulkin's account of the intensity, persistence, and
limiting effects of his symptoms was not credible.  <u>See</u>
<u>generally</u> Social Security Ruling 96-7p, 1996 WL 374186, at *2
(July 2, 1996).[2]  In reaching the latter determination, the ALJ
relied largely on the treatment notes of Dr. Sadowsky and on Dr.
Swinburne's consultative opinion.  I find his analysis of both
sources incomplete and insufficient.

I first address the ALJ's use of Dr. Sadowsky's notes.  The
majority of the ALJ's discussion of those notes concerns various
facts that are taken to impugn Shulkin's self-reported
limitations.  The ALJ mentions Shulkin's fair marks in school,
his prior part-time jobs and a summer photography job, and his
plans at one point to join a gym and do volunteer work.  Without
analysis, the ALJ labels these facts as "inconsistent" with
Shulkin's alleged limitations.  On their face, however, none of
the facts conflict with Shulkin's asserted inability to do full-
time work.  Neither the fact that he was able to attend 12-15
hours per week of college classes, nor that he was able to do

---

[2] The ALJ's two determinations reflect the proper two-step mode
of analysis for evaluation of a claimant's symptoms and their
limiting effects.  <u>See</u> Social Security Ruling 96-7p, 1996 WL
374186, at *2 (July 2, 1996) (ALJ must first consider whether
the claimant's medical conditions could cause the alleged
symptoms, and then, if that threshold is met, the ALJ must
consider whether, based on the entire record, the claimant's
statements about those symptoms are credible).

work on a non-full-time basis, directly contradict Shulkin's claim that he is able to work only for short stretches and with frequent break opportunities.  The ALJ may be inferring something non-apparent from these facts, but his mere labeling of them as "inconsistent" is not sufficient.  See Waters v. Bowen, 709 F. Supp. 278, 284-85 (D. Mass. 1989) (explaining that it does not undermine a claimant's assertions of limited activities for an ALJ to reference performance of other activities that are not inconsistent with claimant's assertions).

The much larger problem, however, is the ALJ's treatment of Dr. Swinburne's opinion.  Although the ALJ discusses the opinion as if Dr. Swinburne had clearly stated that Shulkin could adapt to a full-time work environment, the opinion itself is quite equivocal.  On the one hand, the ALJ correctly notes that Dr. Swinburne believed Shulkin could focus and complete tasks, relate to others in a socially appropriate manner if necessary, and understand and remember simple instructions.  On the other hand, the ALJ fails to note that Dr. Swinburne stated that Shulkin "would experience significant anxiety which may interfere with him providing reasonably good attendance," that Shulkin would be "avoidant of going to the job site and encountering people and the demands of the job," and that

Shulkin would "have difficulty tolerating the average stressors
found on most jobs."  Most troubling is the ALJ's failure to
mention Dr. Swinburne's belief that Shulkin "would hold in his
anxiety and build up a stress level that will become
overwhelming within a day or two resulting in his leaving the
job or not returning."

Thus, Dr. Swinburne expressly opined that Shulkin's anxiety
and stress would prevent him from regularly working a full-time
job.  The ALJ erred in failing to account for this major
divergence between his determination and Dr. Swinburne's
opinion.  Although the ALJ may have been able to reconcile the
statements contrary to his position with other statements in the
opinion that supported his finding, the ALJ was not entitled to
merely rely on the opinion as unambiguous support for his
position.  Without explaining why he disregarded the portions of
the opinion contradicting his view, it is not clear whether the
ALJ considered and rejected Dr. Swinburne's perspective on
Shulkin's ability to hold a job for more than a day or two, or
whether the ALJ merely overlooked important and highly probative
portions of the opinion.  See Lord, 114 F. Supp. 2d at 14
("[B]ecause the ALJ's decision completely failed to mention
[certain] evidence, it is impossible to determine whether this
evidence was considered and implicitly discredited or instead

was simply overlooked."); see also Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981), reh'g denied, 650 F.2d 481 (without indicating the evidence that was rejected, a "reviewing court cannot tell if significant probative evidence was not credited or simply ignored").

## C.  Failure to Address Central Conflict

        In sum, because he ignored the testimony of Mr. Shulkin, and because he construed, without explanation, Dr. Swinburne's opinion and Dr. Sadowsky's treatment notes in counterintuitive ways, the ALJ failed to show that he addressed the central conflict in the evidence.  The essential question in this case was whether Shulkin, despite an ability to function at some level, was rendered unable by his mental illnesses to function at a high enough level to maintain full-time employment.  By cherry-picking the evidence that supported some level of functionality, and by ignoring the evidence showing a possible ceiling on that functionality, the ALJ's opinion elided the difficult question.  He "adopt[ed] one view of the evidence, 'without addressing the underlying conflict.'" Dube, 781 F. Supp. 2d at 35 (quoting Callahan, 997 F. Supp. at 182).

        Because he failed to demonstrate that he considered the portions of the record that conflict with his conclusion, the ALJ's determination cannot withstand review.  See Chater, 172

F.3d at 35. I must therefore reverse the Commissioner's decision. I do not speak to the ultimate merits of Shulkin's claim, but I require only that the ALJ indicate that he has considered all the relevant contrary evidence before reaching his determination. Once he addresses that evidence, it is his duty, and not mine, to resolve the remaining conflicts.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, I deny the Commissioner's motion to affirm (Doc. No. 11) and grant Shulkin's motion to reverse (Doc. No. 6). Pursuant to 42 U.S.C. § 405(g), I remand this case to the Social Security Administration for further proceedings consistent with this decision. The clerk is directed to enter judgment accordingly.

SO ORDERED.


<u>/s/Paul Barbadoro</u>
Paul Barbadoro
United States District Judge

January 11, 2012

cc: Jeffry A. Schapira, Esq.
    Gretchen Leah Witt, Esq.